J-A04003-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: S.P., A MINOR    :    IN THE SUPERIOR COURT OF
                                     :          PENNSYLVANIA
                                     :
APPEAL OF: S.P., A MINOR             :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :
                                     :    No. 1043 EDA 2018

Appeal from the Dispositional Order March 1, 2018
In the Court of Common Pleas of Montgomery County Juvenile Division
at No(s):  CP-46-JV-0000439-2016

BEFORE:  LAZARUS, J., KUNSELMAN, J., and COLINS, J.*

MEMORANDUM BY LAZARUS, J.:                **FILED MARCH 12, 2019**

S.P., a minor, appeals from the dispositional order, entered in the Court of Common Pleas of Montgomery County, adjudicating him delinquent of involuntary deviate sexual intercourse,[1] indecent assault,[2] and indecent exposure.[3]  After careful review, we affirm based on the opinion authored by the Honorable Wendy Demchick-Alloy.

Around 11:00 PM on May 13, 2016, S.P. met his 15-year-old victim, A.E., and her high school classmate, E.H., at Penn Wynne Park to smoke marijuana.  A.E. and E.H. smoked S.P.'s marijuana, while S.P. remained sober.

_____

[1] 18 Pa.C.S.A. § 3123(a)(1).

[2] 18 Pa.C.S.A. § 3126(a)(2).

[3] 18 Pa.C.S.A. § 3127(a).

*Retired Senior Judge assigned to the Superior Court.

Afterwards, S.P. demanded payment. When A.E. and E.H. told him they had no money, S.P. suggested compensation in the form of sexual gratification. E.H. refused and physically distanced herself. S.P. grabbed A.E. and told E.H. to give them privacy. Once E.H. walked away, S.P. proceeded to forcefully touch A.E.'s buttocks, put his hand inside A.E.'s leggings, and rub A.E.'s genitals. S.P. then exposed his penis, grabbed A.E.'s neck, and demanded oral sex. A.E. repeatedly refused S.P.'s advances. After E.H. returned, A.E. managed to free herself of S.P.'s grip and leave with E.H.

At trial, in addition to the testimony of A.E. and E.H., the Commonwealth offered into evidence video surveillance confirming S.P., A.E. and E.H. were present at Penn Wynne Park. This video was time-stamped, indicating the assault took place between 11:28 PM and 11:36 PM. S.P. introduced text messages sent between A.E. and her mother at 11:30:38 PM, 11:31:34 PM, and 11:37:37 PM, arguing the time stamps indicated A.E. was texting her mother at the same time she claimed to have been sexually assaulted. On June 17, 2016 the juvenile court adjudicated S.P. delinquent. On July 6, 2016, the juvenile court held a dispositional hearing and placed S.P. on probation until further order. S.P. did not file a post-dispositional motion pursuant to Pa.R.J.C.P. 620, but filed a timely appeal. Both S.P. and the juvenile court complied with Pa.R.A.P. 1925.

In his appeal, S.P. raised one claim challenging the sufficiency of the evidence, one evidentiary claim, and five claims challenging the weight of the

evidence.  *In the Interest of S.P.*, 2508 EDA 2016, at 2–3 (Pa. Super. September 21, 2017) (unpublished memorandum).  This Court deemed his sufficiency and evidentiary claims waived, but remanded the case to give S.P. an opportunity to file a post-dispositional motion *nunc pro tunc* so the juvenile court could render a specific ruling as to S.P.'s challenges to the weight of the evidence.  *Id.* at 6.  S.P. filed a post-dispositional motion, which Judge Demchick-Alloy denied in its entirety.

This timely appeal follows, in which S.P. raises the following claims for our review:

1. Was the evidence insufficient to find that the defendant committed the crimes of [involuntary deviate sexual intercourse, indecent assault, and indecent exposure]?

2. Did the trial court abuse its discretion by ignoring the evidence of the surveillance video marked as Commonwealth Exhibit 8 giving the time of the alleged assault and defense Exhibit 1, the discovery compact disc containing the times of the text messages between the victim and her mother indicating that the victim was texting her mother at the time of the alleged assault?

3. Did the trial court abuse its discretion by not giving the defendant's character evidence sufficient weight?

Brief of Appellant, at 4.

We begin by noting this Court expressly stated S.P. waived his sufficiency claim, remanding the case solely to develop S.P.'s claims as to the weight of the evidence.  *In the Interest of S.P.*, *supra*, at 8 ("[W]e conclude [S.P.] waived his challenges to the sufficiency of the evidence. . . . We remand for further proceedings limited to [S.P.'s] challenge to the weight of the

evidence.") (citing ***In the Interest of J.B.*** 106 A.3d 76, 95–6 (Pa. 2014) (holding juvenile's weight of evidence claim not waived when not raised in post-disposition motion but raised in statement of matters complained of on appeal and ruled on by trial court)). According to the law of the case, we are consequently precluded from revisiting S.P.'s sufficiency claim. ***See Commonwealth v. Paddy***, 800 A.2d 294, 311 (Pa. 2002) ("[A] court acting at a later stage of a case should not reopen questions decided at an earlier stage by another judge of the same court or a higher court.").

S.P.'s second and third claims challenge the weight of the evidence. When challenging the weight of the evidence, relief in the form of a new trial may be granted only where the verdict shocks one's sense of justice. ***Commonwealth v. Champney***, 832 A.2d 403, 408 (Pa. 2003) (citation omitted). Where the trial court has ruled on a weight claim, our review is limited to determining whether the trial court "palpably abused its discretion in ruling on the weight claim." ***Id.*** It is not our role, as a reviewing court, to reweigh the evidence and substitute our judgment for that of the fact-finder. ***Commonwealth v. Mitchell***, 902 A.2d 430, 449 (Pa. 2006).

In her opinion dated May 9, 2018, Judge Demchick-Alloy concluded that all of S.P.'s appellate issues were without merit. Specifically, the court found: (1) A.E., and E.H. testified credibly as to S.P.'s actions; (2) E.H.'s testimony corroborated A.E.'s version of events and vice versa; (3) the evidence did not support an inference A.E. was motivated to lie; (4) as no evidence suggests

the time data retrieved from the text messages and the video recording were synchronized to a common reference point, the data are of no probative value in proving the absence of sexual contact or impugning A.E.'s credibility; (5) A.E. promptly reported S.P.'s assault; and (6) the trial court, as the finder of fact, properly accorded S.P.'s character witnesses less weight than the credible evidence proving his delinquent acts beyond a reasonable doubt. Trial Court Opinion 5/9/18, at 4–23.

After reviewing the parties' briefs, the certified record, the issues raised on appeal, and relevant case law, we conclude that the trial court opinion, authored by Judge Wendy Demchick-Alloy, thoroughly addresses the weight claims raised on appeal by S.P. We, therefore, rely upon Judge Demchick-Alloy's decision in affirming the dispositional order adjudicating S.P. delinquent. The parties are directed to attach a copy of Judge Demchick-Alloy's decision in the event of further proceedings in this matter.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/12/19

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

JUVENILE COURT

In the interest of S.P.                :        No. CP-46-JV-0000439-2016

**OPINION**

DEMCHICK-ALLOY, J.                                    MAY 9, 2018

The undersigned adjudicated S.P., a juvenile, delinquent on June 17, 2016, having found beyond a reasonable doubt that he committed delinquent acts in the nature of: indecent exposure, 18 Pa. C.S. § 3127(a); indecent assault, 18 Pa.C.S. § 3126(a)(2); and attempted involuntary deviate sexual intercourse, 18 Pa.C.S. § 3123(a)(1). S.P. appealed the adjudication of delinquency after the undersigned filed a dispositional order July 6, 2016 committing him to a term of probation. On appeal, S.P. filed a statement of errors and brief that raised seven claims of error. See Superior Court Opinion of September 21, 2017, pp. 2-5. One claim challenged the sufficiency of the evidence to support the adjudication of delinquency; another challenged the authenticity of the Commonwealth's Exhibit C-5; and the last five challenged the weight of the evidence. The Superior Court ruled that S.P. had waived the first two challenges but remanded the case for further proceedings limited to his challenge to the weight of the evidence. *Id.* at 8. S.P. filed a post-sentence motion, which the undersigned denied in its entirety after hearing argument. The instant appeal followed.

In response to an order pursuant to Pa.R.A.P. 1925(b), S.P. has filed a statement raising eight claims of error on appeal (hereinafter the Statement).

He claims the evidence was insufficient to support a conclusion that he committed the delinquent acts. The Superior Court's opinion expressly stated that appellant waived this claim and remanded the matter only to enable S.P. to develop and preserve for appeal his claims as to the weight of the evidence. That is now the law of the case and cannot be disregarded.[1] Alternatively, the undersigned incorporates by reference the discussion in the opinion dated September 30, 2016, pp. 1-4 in satisfaction of the obligation to specify the place in the record where the reasons supporting the sufficiency of the evidence may be found. Pa.R.A.P. 1925(a).

S.P.'s remaining claims of error pertain to the weight of the evidence. This opinion will begin by integrating a recitation of the facts into a discussion of the weight of the evidence. To foster clarity, the discussion will take the claims out of the order listed in the Statement.

## DISCUSSION

This is a case of a young man who called himself a trapper. N.T. 6-15-16, p. 39; N.T. 6-16-16, p. 36. He did, in fact, trap a young woman by exploiting her vulnerability. The weight of the evidence supports the adjudication the trapper, S.P., committed delinquent acts against the young

---

[1] "The core of the doctrine [of the law of the case] is that a court acting at a later stage of a case should not reopen questions decided at an earlier stage by another judge of the same court or by a higher court." Commonwealth v. Paddy, 800 A.2d 294, 311 (Pa. 2002). "It is hornbook law that issues decided by an appellate court on a prior appeal between the same parties become the law of the case and will not be reconsidered' upon a subsequent appeal on another phase of the same case." Commonwealth v. Tilghman, 673 A.2d 898, 903 n.8 (Pa. 1996) (quoting Burke v. Pittsburgh Limestone Corp., 100 A.2d 595 (Pa. 1953)).

2

woman, A.E., that would have constituted the offenses of indecent exposure, indecent assault and attempted involuntary deviate sexual intercourse if he had been an adult. A.E.'s testimony was corroborated by her friends E.H. and O.G., and by inculpatory statements S.P. made to A.E. and O.G. Other evidence at issue in this appeal included:

- a video recording of some of the events in question, taken by a surveillance camera (see Statement, item three);

- testimony that A.E. did not sustain bruises following the delinquent acts (see Statement, item two);

- testimony that A.E. experienced symptoms of a urinary tract infection or sexually transmitted disease following the delinquent acts (see Statement, item six);

- text messages exchanged between A.E. and her mother around the time of the delinquent acts (see Statement, items four and five);

- testimony regarding prompt complaint (see Statement, item seven); and

- character evidence (see Statement, item eight).

The undersigned explained on the record that in arriving at findings of fact, she decided the credibility of A.E., E.H. and O.G. by weighing demeanor, possible bias and any corroborating evidence supporting the account of each. (See transcribed notes of adjudicatory hearing 6-17-16, pp. 2-3 (hereinafter "Notes of Adj. Hg.").) This discussion will review the demeanor and possible biases of

3

these three witnesses before reviewing the other evidence in the order given above.

**Bias and demeanor of A.E., E.H. and O.G.**

A.E., E.H. and O.G. were, at the time, ninth-grade students at the Lower Merion High School. N.T. 6-15-16, p. 5; N.T. 6-16-16, p. 3; *id.* at 77-78. The three were close friends. N.T. 6-16-16 at 3, 78. S.P. was a tenth-grade student at the high school, N.T. 6-15-16 at 5; N.T. 6-16-16 at 3. E.H. had known S.P. since she was in the fifth grade. N.T. 6-16-16 at 4. O.G. knew him only as an acquaintance. *Id.* at 77-78, 84-85. No evidence of record suggested that either E.H. or O.G. harbored any animosity toward S.P. before the events of May 13, 2016. Therefore, while E.H. and O.G. may have been biased in favor of A.E. by the bond of friendship, no evidence suggested they had any bias against S.P. during the relevant time. Notes of Adj. Hg. at 9-11, 17.

All three girls were articulate and intelligent. *Id.* at 15. O.G.'s demeanor was responsive and lacking in any apparent stress or annoyance with S.P.'s lawyer during cross-examination. *Id.* at 18. E.H.'s demeanor was animated, and she displayed some stress or annoyance during cross-examination, but not to an extent that undermined her credibility. *Id.* at 14-16. Her candid admission that she failed to see any delinquent acts underscored her honesty, as did her admission that she exhibited poor judgment and a lack of faithfulness by failing to stand by her friend, A.E. *Id.* at 16-17.

A.E. exhibited a steady disposition. She was not overly emotional despite

4

being somewhat annoyed ("snippy") with S.P.'s lawyer on cross-examination. *Id.* at 3-4; *see also id.* at 4-5 (discussing A.E.'s demeanor during videotaped interview). Her testimony included inconsistencies and inabilities to explain herself, *id.* at 3, but they were minor. Her credibility was enhanced by the fact that her complaint and testimony admitted her own delinquent acts of possessing and smoking marijuana. *Id.* at 7-8.

The evidence of record suggests that A.E. had no ulterior motive, no incentive to falsely accuse S.P. of any delinquent acts. *Id.* at 5-7. A.E. unashamedly admitted that she had had sexual intercourse three times while dating S.P. for only two or three weeks in the beginning of the 2015-16 academic year. N.T. 6-15-16 at 6. A.E. testified she broke off the relationship because S.P. was mean, insulting and angry. N.T. 6-15-16 at 6-7, 60. Soon after, A.E. developed an interest in another boy, "Eric," N.T. 6-15-16 at 8, although she repeatedly declined to call him her boyfriend, and instead said she was "talking to" him. She denied that she began dating another boy while she was involved with S.P. N.T. 6-15-16 at 60-61. She did not want to return to the sexual relationship with S.P., but he was upset that it was over and wanted to reestablish it. N.T. 6-15-16 at 7-8. She testified S.P. "said that he wanted to get on my good side again." *Id.* at 8.

S.P. has argued that the history of their relationship supports an inference that A.E. was jealous of S.P. and harbored a motive to hurt him. The weight of the evidence shows the opposite: she was "over" him, and it was he

5

who felt rejected, missed the sexual relationship and had reason to feel hurt and jealous of A.E.'s new interest in Eric. He was pursuing her, so he had a reason to feel angry and a motive to hurt her if she continued to reject him.

**Corroboration of eyewitness accounts (Statement, items two and three)**

A.E. and E.H. both testified that on the evening of Friday, May 13, 2016, A.E., E.H. and another female friend were at a fair in Havertown, Pennsylvania when A.E. received a cell phone call from S.P. N.T. 6-15-16 at 8-9; N.T. 6-16-16 at 42. He invited her to meet him on the grounds of the Penn Wynn Elementary School in Lower Merion to smoke marijuana. N.T. 6-15-16 at 10-11. He initiated the contact, he proposed they meet, and he suggested they get high together. The trapper had set his trap, and A.E. took the bait.

A.E. and E.H. went together to meet S.P. at the school. N.T. 6-15-16 at 11; N.T. 6-16-16 at 9. S.P. had only a small amount of marijuana on his person, N.T. 6-15-16 at 9. A.E., or E.H., or both of them, also possessed a small amount. N.T. 6-15-16, pp. 12-13, 77; N.T. 6-16-16, p. 70. The young women smoked S.P.'s marijuana, not theirs. N.T. 6-16-16 at 9. None of the three juveniles had paraphernalia to smoke marijuana, so they retrieved a used water bottle from a recycling bin and S.P. fashioned it into a makeshift pipe. N.T. 6-15-16, pp. 13, 17-18; N.T. 6-16-16, pp. 9-10. It will be seen to be relevant to appellant's theory of the case that S.P. handled the trash-picked bottle with his fingers.

Appellant did not smoke with the young women, but instead remained

6

sober while they became intoxicated. N.T. 6-16-16 at 39. They were relatively more vulnerable to S.P. because they were intoxicated but he was not; and they were at least indebted to him for his generosity in having provided the marijuana. Moreover, the young women would have had a disincentive to call for help if endangered, as one or both possessed marijuana and both surely had the odor of burned marijuana on the breath. In contrast, S.P. would not have looked or acted as if under the influence of marijuana; his breath would not have smelled of marijuana smoke; and he would not have been in possession of drug paraphernalia.

Counsel for S.P. argued that the credibility of the young women is open to question because they testified that S.P. invited them to meet him to smoke marijuana, yet he arrived at the school grounds without paraphernalia to smoke it. One could make that inference, but in view of the foregoing facts, one may instead infer that he intentionally brought no paraphernalia and only a small amount of marijuana, so that after he had gotten the young women high, he would have been in possession of no paraphernalia and no contraband. One may infer that this too was part of the plan devised by the trapper.

Although the young women accepted appellant's offer to smoke his marijuana, *id.*, the three youths apparently did not have a complete meeting of the minds: both young women testified they believed appellant was going to share his marijuana *gratis*; but when they were ready to go home, appellant

7

demanded to be paid. N.T. 6-15-16, pp. 21-22; N.T. 6-16-16, pp. 11-13, 56-58, 84. When the young women told appellant they had no money, he suggested compensation in the form of sexual gratification. Both of the young women testified that S.P. said one or the other would have to give him sex. N.T. 6-15-16, p. 22; N.T. 6-16-16, pp. 12-13, 35-36.

E.H. specifically stated that appellant wanted to receive oral sex. N.T. 6-16-16 at 56-58. Both women testified that E.H. immediately refused and distanced herself from S.P. N.T. 6-15-16 at 22; N.T. 6-16-16 at 12-13. E.H. testified that she turned momentarily to find a place to discard the trash-picked bottle, and when she turned back she saw that S.P. had grabbed A.E. by the arm. N.T. 6-16-16 at 14. A.E. testified that S.P. said to E.H., "give us privacy." N.T. 6-15-16 at 22. E.H. testified that she laughed at first because A.E. was giggling nervously and S.P. was using an "asking tone" of voice. N.T. 6-16-16 at 16-17, 24, 26. Both women testified that S.P. placed his hand on A.E.'s breasts and buttocks while grabbing and pulling her toward a dark playground area as she stumbled and tried to resist him. N.T. 6-15-16 at 22, 23, 26, 81; N.T. 6-16-16 at 14, 15-16, 39, 43. A.E. testified, "He was feeling my butt, and he was behind me...and I was sort of walking, but I was tripping over my feet walking toward that area, and so was he. N.T. 6-15-16, pp. 22-23. The surveillance video showed S.P. grope A.H.'s buttocks as he pulled her, stumbling along. N.T. 6-15-16 at 80. E.H. testified that she followed behind as A.E. continued to giggle nervously and repeatedly said "no," while S.P.

8

responded by pulling more aggressively. N.T. 6-16-16 at 16-17, 24, 59. E.H. testified, "He was grabbing her boobs and her butt, and since...she was high, it was more like he was dragging her over there." *Id.* at 43; *see also id.* at 39.

S.P. led A.E. toward a bench in the darkest part of the playground, but E.H. veered off toward a swing set in a lighted area. N.T. 6-16-16 at 17, 18, 42-43, 49; see also N.T. 6-15-16 at 23. After that, the surveillance video was unhelpful because of the darkness. S.P. claims on appeal that the video reveals that no assault occurred. That is misleading; the video does not reveal *whether* an assault occurred. The testimony of the two eyewitnesses does.

E.H. testified she could see nothing of what was happening between S.P. and A.E. at the bench because it was completely dark over there, she did not have her glasses, and she was high. N.T. 6-16-16 at 18, 21, 49, 52-53. She could hear, though. S.P. was now using an aggressive, demanding, serious tone of voice, saying "come on, come on, just do it;" and A.E. was using a stern tone of voice, saying "no, chill." N.T. 6-16-16 at 19-20, 25, 50, 52. E.H. heard A.E. speaking to appellant in a stern voice, and heard appellant tell her in an aggressive, demanding tone of voice, "hurry up and do it." *Id.* at 25-26; see also N.T. 6-15-16, pp. 35-36. Hearing this, E.H. went toward the voices to ask A.E. to go home with her, then saw A.E. seated on the bench with S.P. standing in front of her, and got the impression that S.P. was still trying to get A.E. to perform oral sex in the darkness. N.T. 6-15-16 at 52-54. As E.H. approached the bench, S.P. told her "shoo, shoo little sis." N.T. 6-16-16 at 20. Both young

9

women testified that A.E. then said, "no, no, don't leave me." *Id.*; see also N.T. 6-15-16 at 24. But E.H. left. N.T. 6-15-16 at 72.

Under questioning by the court and cross examination by S.P.'s lawyer, E.H. steadfastly denied that she walked away because she felt assured A.E. was in no real danger. E.H. consistently admitted that she was afraid for her own safety and was also afraid of provoking S.P. into doing something aggressive to A.E., so she walked off to a lighted area. N.T. 6-16-16 at 23-25, 51-52, 60-65. "I was feeling extremely uncomfortable," E.H. testified. *Id.* at 21. "It was late at night, and it was dark, and we were both high, and I just wanted to go home." *Id.* Her demeanor showed her embarrassment that she let her friend down in a time of need.

E.H.'s testimony largely corroborated A.E.'s. A.E. testified that S.P. pulled her into a dark, isolated area next to a set of "monkey bars" opposite the swing set. N.T. 6-15-16 at 24, 26, 27, 52, 53-54. While she and S.P. were standing, *id.* at 24, S.P. dug his hands inside her tights and rubbed her vagina "very hard" through her underpants and around the leg-hole of the garment, *id.* at 28. Two facts about this testimony bear special importance. First, A.E. did not testify that S.P. rubbed her "vaginal area." She expressly testified that he rubbed her vagina forcefully, although her underpants prevented direct contact. She told E.H. she felt soreness the next day. N.T. 6-15-16 at 46. Second, S.P. was rubbing with his fingers, which earlier had been handling the trash-picked bottle, and he was trying to work them "around the side" of her

10

underpants (*i.e.*, through the leg-hole) to establish skin-to-skin contact with her vagina.

At that time, A.E. was telling appellant to stop and holding his wrist, trying to get his hand out of her pants. N.T. 6-15-16 at 28. She told him she would get him money, but he insisted on oral sex. *Id.* at 34. S.P. pulled A.E. to a bench three steps away, put his hands on her shoulders and forcefully sat her down. *Id.* at 29. He continued to hold her with one hand while, with the other, he exposed his erect penis, grabbed her hand and forced it to stroke it. *Id.* at 29-32, 88. He put one hand, then two, on her neck and, while still holding her down, pulled her head toward him, telling her "to give him a quick bop," a slang term for oral sex. *Id.* at 32-34. All this time, she kept saying "stop," and "no," but did not call for E.H. or yell for other help. *Id.* at 32-34, 72-74, 85-87.

A.E. sustained no bruises as a result of the incident. N.T. 6-15-16 at 82-83; N.T. 6-16-16 at 45-46. On the other hand, she testified that her neck hurt for almost thirty minutes afterward. N.T. 6-15-16 at 83-84. S.P. argues that the lack of bruising undermines the weight of A.E.'s testimony. The undersigned judge saw the partial video recording of the incident, and witnessed the demeanor, volume and tone of voice of the young women as they testified. Based the evidence presented live, in court, the undersigned finds that A.E. was sufficiently drugged and intimidated--trapped--that S.P. needed to apply relatively little physical force. Hence, it is unsurprising that A.E.

11

sustained no bruises, but did experience temporary pain. *See* Notes of Adj. Hg. at 24.

E.H. was gone for approximately five minutes while S.P. was holding A.E. by the neck, forcing her to stroke his penis and trying to force her to perform oral sex. N.T. 6-16-16 at 26. During that time E.H. could neither see nor hear them. *Id.* at 23, 26. When she returned, she saw the two "almost touching," *id.* at 66-67, and she saw A.E.'s hands flailing as she pushed him back, *id.* at 28, 69-70. The cold record cannot convey how spontaneous, and thus credible, her demonstration was as she stood up and made a sudden, forceful shoving motion with both arms. *Id.* at 69-70; *see also* Notes of Adj. Hg. at 14-15. A.E. testified that she got S.P. to loosen his grip by swinging her arms and trying to kick him with her feet, just as E.H. returned. N.T. 6-15-16 at 35-36.

Counsel for S.P. argued that E.H.'s testimony undermines A.E.'s testimony that S.P. had exposed his penis, and as a consequence, undermines her testimony about all that followed. On cross examination, E.H. testified that when she returned to the bench to see A.E. free herself from S.P.'s grip, she did not see his hands on her neck, nor did she see him pull up his pants or put his penis back into his pants. N.T. 6-16-16 at 66-67. It is not surprising that she could see only gross movement, given that she testified that S.P. and E.H. were in a dark area, she did not have her glasses, and she was high. She testified, "I was confused," and "All I said to myself is, what did I miss?" *Id.* at 67. Although she testified that she gave S.P. and A.E. no notice she was

12

approaching, *id.*, she was coming from a lighted area, hence S.P. could have seen her approach, which would have prompted him to cover his penis. That would be consistent with A.E.'s testimony that S.P. had pulled up his pants before E.H. came close. N.T. 6-15-16 at 89. Interpreting the testimony of E.H. and A.E. in that manner has the additional advantage of explaining why it was, at that moment, A.E. had been able to wrench free of S.P.'s grip. The weight of this evidence favors, rather than undermines, the adjudication of the delinquent acts.

Moreover, by asking E.H. whether she saw S.P. zip his pants, S.P.'s lawyer made assumptions, not supported by evidence of record, that S.P.'s pants had a zipper, and that he wore them in a manner that would have required him to unzip the zipper in order to expose his private parts. The trial lawyers did not ask A.E. or E.H. what type of pants S.P. did or did not wear, or how he did or did not wear them. A.E. was uncertain as to how far, or even whether, S.P. unzipped his trousers. When asked on direct examination, "Did he unzipper his pants?" A.E. testified "I don't remember." *Id.* at 30. Likewise, when asked on cross-examination, "Did he zipper his pants back up? Did he have to button them?" she replied, "I don't remember." *Id.* at 90. On the other hand, on cross-examination, A.E. interrupted a question by saying "unzip" to correct S.P.'s lawyer when he asked, "Was he able to take his pants down...?" N.T. 6-15-16 at 88. She also said S.P. "put his hand on my shoulder and unzipped with the other hand," and "just pulled out his penis on top of the

13

zipper." *Id.*

A.E.'s other testimony suggests that S.P. was wearing his pants so low they required little or no downward movement for him to expose his erect penis. When asked on cross examination, "How far were his pants down," she replied, "I wouldn't say they were down. He just pulled out his penis on top." *Id.* Likewise, she stated, "They were not all the way up, but they were a little down. They were not, like, to his ankles." *Id.* That statement suggests S.P. may not have needed to unzip much at all. That inference is consistent with A.E.'s statement that he "pulled out his penis on top of the zipper." Readers familiar with male anatomy and the design of zippered trousers should not need a graphic explanation in order to understand how that statement corroborates A.E.'s other testimony that S.P. did not fully unzip and lower his pants.

Counsel for S.P. argued that A.E.'s testimony lacked credibility because one would expect a young woman in her situation to have yelled out for her friend and screamed for help under the circumstances. That argument is not persuasive, because A.E. was frightened, *id.* at 53-54, and knew she was on school grounds with marijuana and with the odor of marijuana on her breath. If she yelled for help, she knew she and E.H. risked being arrested for using or possessing a controlled substance. She had little reason to call for E.H., who just had abandoned her after she said "don't leave me." When asked on cross-examination why she did not yell for help, she replied, "Because I was scared,

14

nervous and I did not know what to do." *Id.* at 86. She continued, "I did not want to be touched. I wanted to go home." *Id.* at 86-87. It is not difficult to infer that A.E. did not cry out because she was petrified by a combination of intoxication and fear. In that regard, it is significant that E.H. testified that as she and A.E. walked away from the schoolyard, A.E. began crying and breathing heavily, and continued to do so for ten minutes. N.T. 6-16-16 at 28-29. E.H. thought she was going to have a panic attack. *Id.* at 29. A.E. corroborated her testimony: "I was crying, shaking. I was just very scared and upset." N.T. 6-15-16 at 36.

S.P. made two inculpatory statements that corroborate the testimony of A.E. and E.H. Only hours after the delinquent acts, A.E.'s friend O.G. received a Snapchat message from S.P. demanding, "you need to get your friends, I need my money." N.T. 6-16-16 at 80. S.P. contacted O.G. again at approximately 9:00 p.m. on May 14, 2016, this time via Facetime (an audio-video connection via cell phone), and gave her an account of the incident that was, as far as it went, entirely consistent with A.E.'s and E.H.'s accounts. *Id.* at 82. "He said that he was hanging out with them, and they smoked. He asked them for money, and they didn't have any. So he asked for a blow job, and he never really told me if [A.E.] said yes or no...." *Id.* at 83. On cross-examination O.G. did not waver: "He said that he asked them to hang out, and they said yes, and they hung out, and they smoked together, and he wanted money, but they didn't have any for him. So he asked her for a blow job." *Id.* S.P. apparently

15

did not tell O.G. he attempted to force A.E. to engage in oral sex, made sexual contact with her by force, or exposed his penis to her, but to the extent the facts he conveyed corresponded with the testimony of A.E. and E.H., it served to corroborate their accounts. The only lack of correspondence between his account and theirs was his self-serving omission of his use of force.

A written statement by S.P., also made promptly after the incident, further corroborated that part of the testimony. A copy of the statement was admitted into evidence as Exhibit C-5. The morning after the incident, appellant sent A.E. a text communication by Snapchat (a mode of communication via internet) that said, in pertinent part, "You [sic] being lit should have made it easier to do it. Don't ask for bud from a trapper and expect it to be free[,]" and "you took the plan of money instead of doing something, so I want my money." N.T. 6-15-16 at 39 & Exhibit C-5. E.H. testified that A.E. showed her the message, and she further testified that the Commonwealth Exhibit C-5 was a copy of that message. N.T. 6-16-16 at 35-36.

Counsel for S.P. has argued that the weight of Exhibit C-5 was diminished because A.E., by her own admission, abridged the entire series of Snapchat messages by deleting her own profanity-laden accusation that initiated the exchange, provoked S.P.'s response, and provided context for understanding it. See N.T. 6-15-16, pp. 90-93, 99-101 (testimony of A.E. on cross- and recross-examination). A.E.'s testimony, *id.*, sufficiently

16

supplemented the missing context necessary to understand what S.P. meant. The accuracy of the exhibit depicting S.P.'s response is corroborated by E.H.'s testimony. N.T. 6-16-16 at 35-36. The header of the message identified the sender as "Stan," a shortened form of appellant's name. No evidence suggests that the complainant altered the text of appellant's messages to her, nor that she altered the image to put the name Stan above a message sent by someone else.

S.P.'s communications to O.G. and A.E. established that he met A.E. on the night of Friday, May 13th with an expectation of sexual relations. *See* Notes of Adj. Hg. at 13-14. Together with the fact that he brought a condom, it suggests he expected and demanded sex in exchange for marijuana. *See id.* The only factual questions are whether sexual contact occurred and whether it was consensual. Testimony about how A.E. reacted when she contracted a urinary tract infection (UTI) several days later suggests S.P. made nonconsensual sexual contact.

**Testimony that A.E. developed a urinary tract infection (Statement, item six)**

Until this point, this opinion has addressed arguments that attempt to negate proof that S.P. had sexual activity with A.E. Those arguments discounted the evidence S.P. groped A.E.'s buttocks or breasts, that he exposed his penis, and that he grabbed A.E. by the neck and tried to force her to perform oral sex. S.P. also seems to argue that he did engage in sexual contact, but A.E. consented to it. S.P.'s lawyer elicited uncontradicted

17

testimony from A.E. and E.H. that A.E. contracted a UTI several days after her encounter with S.P. at the school yard. N.T. 6-15-16 at 94; N.T. 6-16-16 at 73. That testimony is strong corroboration of A.E.'s testimony regarding S.P.'s delinquent acts. A.E. saw S.P. handling the trash-picked water bottle with his fingers before he pushed his hands inside her pants, rubbed her vagina forcefully through her underpants, and tried to make direct contact by wedging his unclean fingers through the leg-hole of her underpants. It is therefore understandable that she blamed S.P. when she felt the symptoms of an infection in her vagina only a few days later.

S.P.'s lawyer insinuated that A.E. became angry after she told another student about the symptoms, and in turn, that student told S.P. *Id.* E.H. testified that A.E. feared it was a sexually transmitted disease (STD), and she was angry that other students at their school were talking about it because she was concerned about what they would think of her. N.T. 6-16-16 *Id.* at 73. S.P. claims on appeal that the undersigned "disregarded the motive of [A.E.] to lie to stay out of trouble with her mother because [she] thought that she had contracted a sexually transmitted disease." S.P. did not supply argument supporting that conclusory claim, and a moment's thought shows that it cannot be supported without explanation. Given that A.E. believed she had contracted a STD, there are several possibilities as to what she might have believed about its origin:

1. she contracted it from physical contact (consensual or non-

18

consensual) with one or more persons not including S.P.;

2. she contracted it from consensual physical contact with S.P.; or

3. she contracted it from non-consensual physical contact with S.P.

Regarding the first possibility, S.P. failed to supply argument explaining why A.E. would have been motivated to lie about sexual contact with S.P. if she believed had been infected by someone else. The facts of record do not explain why A.E. would have expected to benefit from falsely identifying S.P. as the source of the STD. Therefore one who tries to understand the UTI testimony is left with only the second and third possibilities, both of which *concede* sexual contact with S.P., leaving only the question whether it was consensual.

The evidence does not support an inference that A.E. was motivated to lie that the contact was non-consensual. S.P.'s lawyer insinuated that A.E. would have been ashamed if her mother knew she was having consensual sexual relations, though A.E. unashamedly admitted at trial to having engaged in consensual sexual intercourse with S.P. while they were dating. N.T. 6-15-16 at 6. One might speculate that A.E. was motivated to lie because she was in a romantic relationship with Eric, but she repeatedly corrected the prosecutor when she referred to "Eric" as A.E.'s boyfriend, and testified she was only "talking" to Eric. *Id.* Thus, the UTI testimony tends to corroborate A.E.'s claim of non-consensual contact.

### The timing of the text messages and the surveillance video (Statement, items four and five)

Items four and five of the Statement appear to challenge the finding of

19

any sexual contact between A.E. and S.P., but perhaps they concede such contact, but only challenge its non-consensual nature. These challenges are based on circumstantial evidence: the recorded times of certain text messages transmitted between A.E. and her mother, as compared with the time recorded on the surveillance video. As the surveillance apparatus made video recordings, it simultaneously recorded data corresponding to the time of day. Similarly, when A.E.'s cell phone received or transmitted a text message, it simultaneously recorded data corresponding to the time of day. Assuming the time data recorded by each device were synchronized to a common reference, then one could infer from this circumstantial evidence that A.E.'s cell phone was receiving and transmitting text messages at the same time the sexual contact would have taken place. See N.T. 6-16-16 at 110-11, 124-26, 131-34. Any reasonable person would have great difficulty believing A.E. would have been texting with her mother while engaged in consensual sexual contact, and even greater difficulty if the contact was not consensual.

The fatal flaw of this argument is the lack of any evidence in the record proving the two devices were synchronized. Circumstantial evidence is evidence of a fact or set of facts from which the existence of another fact may be reasonably inferred. *Monaci v. State Horse Racing Comm'n*, 717 A.2d 612, 618 (Pa. Commw. Ct. 1998). The facts produced as evidence of record are the foundation of any inference and will determine whether the inference is reasonable. *Id.* A party is not entitled to an inference that amounts to a guess

or conjecture. *Id.* No evidence of record suggests that the timing data in the two specific devices, A.E.'s cell phone and the surveillance apparatus at the school, were synchronized. Nor does any record evidence suggest that timing data is likely to be synchronized among all cell phones and surveillance apparatus. The trier of fact may "use the conclusions and tests of everyday experience and draw the inferences which reasonable men would thus draw from similar facts," *Broad St. Trust Co. v. Heyl Bros.*, 193 A. 397, 398 (Pa. Super. Ct. 1937), but common experience includes instances in which electronic devices are synchronized and other instances in which they are not. See Tr. Op. 9-30-16, pp. 6-7 (citing closing argument of District Attorney, N.T. 6-16-16 at 141.). The synchronization of timing data among such devices, or lack of synchronization, is a body of knowledge that lies outside the ken of lay persons, thus requiring proof by expert opinion. *See, e.g., Burlington Coat Factory of Pennsylvania, LLC v. Grace Const. Mgmt. Co., LLC,* 126 A.3d 1010, 1021 (Pa. Super. Ct. 2015). S.P.'s lawyer argued that the undersigned erred by assuming facts not in evidence, see N.T. in re: Post-Trial Motions, pp. 4-5, but it is he who asks the court to assume facts about synchronization that require proof through expert opinion evidence.

Moreover, S.P. has not clearly articulated whether he claims the time data negates all possible sexual contact or only non-consensual contact. If the former, it seems to conflict with his UTI argument, which appears to concede sexual contact. If the latter, then his claim is that A.E. did indeed interrupt

21

their consensual sexual liaison to assure her mother that she would soon be home. Though dubious, it at least has the advantage of coherence with his UTI argument. The better interpretation of the totality of the evidence is to infer that the cell phone and surveillance camera were not synchronized. Under that interpretation, the time data retrieved from the cell phone and surveillance equipment is of no probative value to the question of contact or consent.

**Prompt complaint (Statement, item seven)**

S.P. contends A.E. "failed to timely report the incident following the alleged assault." The facts of record, in view of the controlling law, indicate otherwise.

> [I]f a complaint is made promptly after the alleged offense, the victim has not had time to fabricate the story and [it] is given more credibility. *  *  * Conversely, if a complaint is delayed substantially without any reasonable explanation, an inference can be drawn regarding the credibility of that complaint and against whether the incident in fact occurred.

*Commonwealth v. Jones*, 672 A.2d 1353, 1356 (Pa. Super. Ct. 1996) (citations omitted). S.P. focuses on the delay between the incident and the moment A.E. reported it to her mother or the police, but the relevant period is the time between the incident and when she reported it to any third party. *See Commonwealth v. Freeman*, 441 A.2d 1327, 1331-32 (Pa. Super. Ct. 1982) (ruling trial judge did not err by admitting testimony of victim's complaint to sister-in-law as evidence of prompt complaint). The morning after the incident, A.E. recounted the events to E.H. in a manner that was consistent with her trial testimony. N.T. 6-16-16, pp. 43-44; see also N.T. 6-15-16, pp. 36-37. On

22

the same morning she gave a similar account of the events to O.G. N.T. 6-16-16, pp. 80-81; see also *id.* at 38-39. That testimony shows a prompt complaint and lends additional weight to the evidence that S.P. committed delinquent acts. The content of A.E.'s prompt complaint corroborates her testimony regarding the incident, reinforcing its weight.

**Character evidence (Statement, item eight)**

Finally, S.P. complains that the undersigned judge did not give adequate weight to the testimony of the character witnesses who appeared on behalf of appellant. When announcing the verdict, the undersigned judge gave extensive consideration to that testimony. N.T. 6-17-16, pp. 25-29. The number of witnesses, and the sincerity and intensity of their testimony was impressive, but on balance, the totality of the evidence in this case indicated that their knowledge of appellant was not complete. They did not know his aspiration to project the image and live the life of a "trapper," which the testimony showed was a slang term for a drug dealer. For that reason, their positive view of S.P. cannot outweigh the rest of the credible evidence proving his delinquent acts beyond a reasonable doubt.

## CONCLUSION

Upon consideration of the foregoing discussion, the undersigned

23

respectfully submits that the finding of delinquency should be affirmed as to all three of the offenses discussed in this opinion.

BY THE COURT,

Wendy Demchick-Alloy, Judge

**Copy of above sent on** 5/15/18 **to:**
Michael I. McDermott, Esquire; 1026 Winter Street, Suite 200; Philadelphia, PA 19107; by first class mail
Robert M. Falin, Deputy District Attorney, Appellate Division, by inter-office mail